Max R. KARGMAN et al., Plaintiffs, Appellees,

v.

Thomas A. SULLIVAN et al., Defendants, Appellees.

Sarah Wean et al., Defendants, Intervenors, Appellants (Two cases.)

Nos. 78–1174, 78–1175.

United States Court of Appeals, First Circuit.

Argued Sept. 13, 1978.

Decided Dec. 26, 1978.

Marcus E. Cohn, Boston, Mass., with whom Richard F. McCarthy, Michael C. Berkowitz, and Willcox, Pirozzolo & McCarthy, Boston, Mass., were on briefs, for Max R. Kargman, et al.

Mark Stern and Brian Michael Olmstead, East Boston, Mass., with whom Stern & Zack, East Boston, Mass., was on briefs, for intervenors.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

This is a dispute over attorneys' fees for work done before the district and appellate courts in *Kargman v. Sullivan*, 552 F.2d 2 (1st Cir. 1977); 582 F.2d 131 (1st Cir. 1978). The Kargman brothers, plaintiffs below, appeal from a district court award of $26,-491.58 made under the common fund doctrine and divided between Mr. Mark Stern, private counsel for Roberta Kracov, et al., defendant-intervenors, and Greater Boston Legal Services for the work of Mr. Brian Olmstead, counsel for Sarah Wean, et al., defendant-intervenors. Stern and Olmstead also appeal, contending that the fee award was too low.[1]

The Kargman brothers, owners of federally-subsidized housing, sued the City of Boston and its rent control officials on November 21, 1971, asserting that the City's rent control levels impermissibly conflicted with the higher rent levels authorized by HUD for HUD-financed housing. Although they obtained a preliminary injunction against enforcement of Boston's rent levels on December 8, 1971, the district court ordered them to deposit with it any rents collected in excess of the rents permitted by Boston's rent board.[2] The court order provided that these funds would be returned pro rata with interest to the contributing tenants if the Kargmans ultimately lost their suit.[3]

Although Kracov and Wean did not intervene until November 16, 1972, almost a year after the preliminary injunction was issued, it is from this escrow fund that the fee award at issue here was made.[4] The inter-

---

1. The original named defendants, the City of Boston and members of its Rent Board, are not involved in this dispute.

2. None of the Kargmans' tenants were parties to the litigation when the preliminary injunction was entered. Although the court enjoined the enforcement of Boston's rent levels, it did not enter any oruers directly against the tenants respecting the payment of rents. Some of the tenants, for financial or other reasons, did not pay even the rents authorized by Boston's Rent Control Board after the escrow fund was established, and hence have no interest in the fund.

3. This order was later modified as necessary in response to changes in the approved rent levels.

4. The record does not indicate the present size of the fund. The district court order suggests, however, that the accrued interest alone exceeds the amount of the award made here. The court and Messrs. Stern and Olmstead therefore characterize the award as coming "out of interest," as if to suggest that it deprives the tenants of no more than a windfall. We find little substance to this argument.

venors represent or constitute some but not all of the Kargmans' tenants. Since 1972 their attorneys have played a prominent role in defending the application of Boston's rent control levels to the Kargmans' buildings.

Although the Kargmans initially prevailed in the district court, the judgment in their favor ultimately was reversed on appeal. 552 F.2d 2 (1st Cir. 1977). We held that the Kargmans' properties were subject to Boston's rent control program until at least October 22, 1975, when a HUD preemption regulation became effective. We remanded for consideration of certain remaining questions.[5] Concerned that the tenants had been without the use of the money paid into the escrow fund for almost six years, we also outlined the following plan for its distribution:

"We . . . think it fair to preserve the escrow fund under this limitation.

1. All funds and interest thereon paid into the fund from its inception to the effective date of HUD's preemption regulation, shall be held subject to the following conditions.

a. If, at any time within three months from the date of this decision, the district court has decided the Equal Protection and Contract Clause claims, this court will entertain a motion for relief or stay pending appeal by a party on either side of the controversy.

b. If, after three months from the date of this decision the district court has not rendered decision for any reason not connected with dilatoriness on the part of defendants and defendant-intervenors, this court will entertain a motion for distribution of the amount in escrow resulting from the payments described in paragraph 1.

2. Payments based on HUD action since the date of the preemption regulation should continue pending the district court's decision on this aspect of the case."

552 F.2d at 14. In August of 1977 Messrs. Stern and Olmstead asked this court to allow attorneys' fees from the fund. We dismissed their request as premature, but "without prejudice to resubmit it at a more appropriate time to the district court."

On September 15, 1977, on remand, the district court decided the remaining issues in favor of the defendants, making it clear that the Kargmans' properties were subject to rent control during the period prior to October 22, 1975. Judgment was entered on September 23. The Kargmans sought relief from this judgment both by moving for a new trial and by appealing to this court again. On September 16, 1977, before the Kargmans had initiated these procedures for relief, Messrs. Stern and Olmstead filed a motion with the district court seeking distribution of the escrow fund and allowances of attorneys' fees from the fund, arguing that a fee award was authorized and appropriate under the common fund doctrine. In their supporting affidavits, Mr. Stern requested $35,186.33 and Mr. Olmstead asked for a "modest" award.

Under the local rules of the district court, any opposition to the motion for attorneys' fees should have been filed with the district court within ten days. D.Mass.R. 12(a)(2). The Kargmans not only did not oppose the motion within that period, they sought no extension of time in which to respond. In addition, at no time before disposition of the motion did they request a hearing, as provided for by the local rules.[6] Instead they waited until after they had filed their motion for a new trial[7] and then, on October 7, attempted to postpone consideration

Having been wrongfully deprived of the use of the funds, the tenants have as much claim to the interest as to the principal.

**5.** The Kargmans originally had raised both equal protection and contract clause claims.

**6.** Under the local rules of the district court, motions are disposed of on the papers sub-

mitted unless the court orders a hearing, which may do on a party's request or on its own initiative. D.Mass.R. 12(c), (d), (e).

**7.** The motion for a new trial was filed on October 3, 1977.

of the motion for fees on the ground that it was premature. Knowing, they say, of no better procedure that would allow them to avoid "addressing and briefing all of the relevant issues when it [in their opinion] was not necessary at that stage of the litigation," they filed what they termed a "motion to strike."[8] This motion read in part as follows:

> "[S]aid motion for [distribution of the fund and attorneys' fees] is premature and untimely in that it was made prior to the expiration of the period of time for filing post judgment motions and an appeal from this Court's judgment of September 23, 1977.
>
> "On October 3, 1977 plaintiffs filed a timely motion for a new trial which motion is currently pending before this Court. A conclusive and final determination of the controversy giving rise to this litigation has not been made at this stage of the proceedings and such a conclusive determination is a prerequisite to the aforesaid motion of the defendant-intervenors. Wherefore, the motion of defendant-intervenors should be stricken."

Nowhere in this motion, or in conjunction with it, did the Kargmans request a hearing or even indicate that they wished to oppose the fees award on substantive grounds.

The district court never ruled formally that it was denying the Kargmans' motion to strike. It did, however, deny the Kargmans' request for a new trial on October 19, 1977, and, on March 14, 1978, allow the motion for attorneys' fees and enter the award that is the subject of this appeal. The court determined that Stern and his associates should receive $26,491.58 and that from this sum $1,324.58 should be awarded to Greater Boston Legal Services for its share of fees for work done by Mr. Olmstead; thus Mr. Stern's actual award was $25,167.

The district court's award was based exclusively on affidavits submitted by Messrs. Stern and Olmstead, the Kargmans having submitted nothing to the court. In making the award the court noted that, "This request for fees is somewhat novel in that the affidavits filed have not sparked opposition. . . . ." After the award was made, however, the Kargmans moved for reconsideration and for the first time requested a hearing in which to contest Stern's and Olmstead's right to an award. In this motion they said that they had not opposed the fees request because they had been waiting for the court to act on their motion to strike. They also informed the court that they had filed an appeal from the judgment of September 1977 and suggested—without citing any authority—that the district court could not consider the request for fees until their appeal was disposed of. The district court denied their motion for reconsideration but stayed the award pending this appeal. We subsequently affirmed its decision of September 1977. 582 F.2d 131 (1st Cir. 1978).

On appeal, Mr. Stern's position is that his award was too low and that Mr. Olmstead's award should have been made separately. The Kargmans challenge the entire award and argue that the court handled their motions to strike and for reconsideration improperly.[9]

■ The Kargmans contend that the district court abused its discretion by not ruling on their motion to strike and by making the attorneys' fees award "without providing the plaintiffs with an opportunity to be heard on the merits." We hold, on the contrary, that the district court proceeded correctly. The Kargmans chose to file neither a timely opposition nor a request for a hearing. The motion to strike that they eventually did file did not indicate

---

8. Although the Federal Rules of Civil Procedure do provide for motions to strike, they do not specify prematurity as a basis for such motions. Fed.R.Civ.P. 12(f).

9. Messrs. Stern and Olmstead have also questioned the Kargmans' standing in this case, asserting that they have no interest in the fund.

The Kargmans respond by pointing out that they are "trustees" of the fund for their tenants. Given the impact of the fees award on the tenants, we are disinclined to avoid deciding the substantive issues which have been raised.

any substantive—as opposed to procedural—grounds for objecting to the motion for fees. It indicated only that the Kargmans considered the request for fees premature. Their request that the issue of fees not be taken up before the motion for a new trial was determined became moot when the new trial was denied. Any remaining objection to the court's considering the request for fees before the underlying case was disposed of on appeal was expressed only indirectly in the motion and was made without citing any supporting authority. Moreover, the Kargmans did not renew or amend their motion to strike after their appeal was actually filed. Even assuming this objection was properly before the court, it was implicitly denied when the fees award was made. While it would have been better practice for the court to have denied the motion to strike formally, it was under no obligation to act on that motion before acting on the fees motion. It did not lie in counsel's power to force a delay in determination of the unopposed fees motion simply by filing a so-called motion to strike.[10] And having sought no hearing on either motion, counsel could hardly have been surprised when none was held.

In choosing to file a motion to strike in response to the motion for fees, the Kargmans appear to have been attempting to force their own timetable on the court. Especially considering that this court's decision of March 1977 indicated that the escrow fund could be distributed before the case was finally disposed of, they proceeded at their own risk in not filing a proper opposition to the request for fees, not requesting a hearing, not communicating further with the court after filing their motion to strike, and in not indicating, even in a perfunctory manner, that they would op-

pose an award of fees if their motion was denied.

■ The Kargmans insist that, regardless of whether their motion to strike was proper, a court may never award attorneys' fees without conducting a hearing. The cases they cite, however, do not go this far. See Perkins v. Standard Oil Co., 399 U.S. 222, 90 S.Ct. 1989, 26 L.Ed.2d 534 (1970) (district court erroneously held Clayton Act did not authorize award of fees for appellate work; award should "as a general rule" be fixed "after hearing evidence"); Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp., 487 F.2d 161, 169 (3d Cir. 1973) (denial of fees reversed with instructions to honor requesting parties' request for evidentiary hearing). While there ordinarily should be a hearing, and especially if a motion for fees is opposed, we are not prepared to rule that a hearing must always be held. See Sargeant v. Sharp, 579 F.2d 645, 647 (1st Cir. 1978). Here, not only did the court have no reason, when it acted, to believe the request for fees was opposed, but, as we note below, it gave adequate consideration to the various equities. Having in mind also the long delay that the tenants have already suffered, we see no purpose that would be served by remanding this case for an evidentiary hearing.[11]

■ The Kargmans also challenge the fees award on various substantive grounds. They argue that the award is not authorized under the common fund doctrine. They point out that the escrow fund from which the award is being made was established by the district court before Stern's and Olmstead's clients intervened, and they argue that there is no evidence that Stern and Olmstead in fact contributed in any signifi-

---

10. If it really would have been too difficult for them to respond to the motion for fees on the merits at that time, the Kargmans could have filed a motion to postpone coupled with an opposition indicating that they would like a hearing when the matter was ripe for decision. If even this was not possible within the time for filing an opposition, they could have moved for permission to file their papers late, attaching a copy of the papers they wished to file.

11. The Kargmans, to be sure, finally made clear their desire for a hearing in their motion for reconsideration. But such motions are largely discretionary with the district court. We find no abuse of discretion in its denial in these circumstances. See Higuera v. Pueblo International, Inc., 585 F.2d 555 at 557–558 (1st Cir. 1978).

cant way to the outcome that preserved the fund for the tenants. They also suggest that there is no evidence that Stern's and Olmstead's clients were among those who paid into the fund and assert that the award of fees will fall disproportionately onto those who did contribute to it.[12] These arguments are vitiated considerably by the Kargmans' failure to raise them appropriately below, and we address them only out of fairness to the tenants who, rather than the Kargmans, must bear the burden of the fees.

Whatever the merits of the award made here, it is true that no award is possible unless it can be made under the common fund doctrine. No attorneys' fees statute is applicable and the "private attorney general" theory for awarding fees is no longer viable, *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). But, when the Supreme Court held in *Alyeska* that fees generally cannot be awarded absent specific statutory authority, it noted several exceptions to this rule, including the common fund doctrine:

"In *Trustees v. Greenough,* 105 U.S. 527, 26 L.Ed. 1157 (1882), the 1853 [Attorneys' Fees] Act was read as not interfering with the historic power of equity to permit . . . a party preserving or recovering a fund for the benefit of others in addition to himself, to recover his costs, including his attorneys' fees, from the fund or property itself or directly from the other parties enjoying the benefit. That rule has been consistently followed. *Central Railroad & Banking Co. v. Pettus,* 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885); *Harrison v. Perea,* 168 U.S. 311, 325–326, 18 S.Ct. 129, 42 L.Ed. 478 (1897); *United States v. Equitable Trust Co.,* 283 U.S. 738, 51 S.Ct. 639, 75 L.Ed. 1379 (1931); *Sprague v. Ticonic National Bank,* 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939); *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24

L.Ed.2d 593 (1970); *Hall v. Cole* [412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973)]; cf. *Hobbs v. McLean,* 117 U.S. 567, 581–582, 6 S.Ct. 870, 29 L.Ed. 940 (1886). See generally Dawson, Lawyers and Involuntary Clients: Attorney Fees From Funds, 87 Harv.L.Rev. 1597 (1974)."

421 U.S. at 257–58, 95 S.Ct. at 1621–1622 (footnotes omitted). Among those cases cited by the Supreme Court in *Alyeska, Sprague* is particularly relevant here:

"That the party . . . neither purported to sue for a class nor formally established by litigation a fund available to the class, does not seem to be a differentiating factor so far as it affects the source of the recognized power of equity to grant reimbursements . . . . [W]hen such a fund is for all practical purposes created for the benefit of others, the formalities of the litigation—the absence of an avowed class suit or the creation of a fund, as it were, through *stare decisis* rather than through a decree—hardly touch the power of equity in doing justice as between a party and the beneficiaries of his litigation."

307 U.S. at 166–67, 59 S.Ct. at 780.

■ These cases make it clear that the federal court may award fees where the legal efforts of the parties seeking the award ultimately benefit everyone with an interest in a fund under court control. The rationale is to prevent the entire cost of legal representation from falling on the few who press the claims of many. These principles apply here, where there is a substantial court-controlled fund that will soon be returned to certain tenants largely, as the court below found, because of the efforts of Messrs. Stern and Olmstead on behalf of their clients. Although Kracov and Wean were individual tenants formally acting on behalf of themselves and not as class representatives, their interests were identical to

---

**12.** The Kargmans also argue that the award "may have been excessive" and take the position that the record is insufficient to determine what the award should be. Having failed to

submit any evidence of their own, however, they are not now in a position to raise these claims.

those of most, if not all, of the tenants in the Kargmans' federally-subsidized housing. Thus the district court, in making the award, found that, "Stern's work has largely resulted in the ultimate triumph to the defendant-intervenors . . . ." Having reviewed this case on several occasions, we too accept the importance of the work of Messrs. Stern and Olmstead in securing a result that will benefit all of the Kargman tenants, not just those that they formally represented.[13]

■ The Kargmans make much of the fact that many tenants, and perhaps all of Mr. Olmstead's tenant-clients, did not contribute to the fund. These tenants, they argue, will benefit from the result of the litigation but will not pay any of its expenses, while those who made their full rental payments and thus "contributed" to the fund will bear the entire burden. This seems to us to misstate the effect of the fee award on the tenants. Messrs. Stern and Olmstead submitted a relatively low request for fees[14] and the district court reduced it further, by 22%, to $26,491.58. The award is plainly well below what comparable attorneys would have received from clients with greater resources than the Kargmans' tenants. And without the two attorneys' services, it is quite possible that none of the tenants would have recovered anything. Based on our review of the record and such inferences as we can draw therefrom, we think the fee award has been discounted to the point where it safely can be assumed that a disproportionate share of the costs of the litigation has not fallen on those tenants who paid into the fund. An award of attorneys' fees under the common fund doctrine is an equitable award made at the discretion of the district court, and we have no reason to think that this discretion was abused here.

Deference to the district court also leads us, however, to deny Mr. Stern's request that we order an increase in his award. The fact that only some of the Kargmans' tenants contributed to the fund may well have been an implicit, if not explicit, factor in the district court's determination of what an appropriate award would be. As a mathematically precise apportionment was not feasible and as a common fund award is an equitable one, we do not feel that the district court order should be disturbed.

The same reasoning leads us not to change the district court's allocation of a portion of Mr. Stern's award to Mr. Olmstead. Although Mr. Olmstead was not associated formally with Mr. Stern, his work did assist Stern in developing his case. In addition, few—if any—of Mr. Olmstead's low-income clients have an interest in the escrow fund. The district court, which had first-hand knowledge of this rather intricate situation, evidently viewed $26,491.58 as the maximum attorneys' fee award that the fund should have to bear. We affirm its judgment.

The court, if it has not done so already, should now take steps to return the balance of the fund to those who are entitled to it.

*The order of the district court is affirmed.*

**13.** We disagree with the Kargmans' arguments that Stern and Olmstead cannot recover from the fund because their clients intervened after it was created. The important fact is that it is because of their efforts that it is to be returned to the tenants.

**14.** The hourly rates requested by Stern for his own work ranged from $35 to $60 per hour. In affidavits it is asserted that fees from $60 to $100 per hour normally would have been charged.